

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-76,345

**MILTON DWAYNE GOBERT, Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL FROM CAUSE NO. D-1-DC-06-904006
THE 331ST JUDICIAL DISTRICT COURT
TRAVIS COUNTY

COCHRAN, J., delivered the opinion of the unanimous Court.

## OPINION

Appellant was convicted of the 2003 capital murder of Mel Cotton by stabbing her

with a knife 107 times in the course of attempting to commit or committing kidnapping or

robbery. Based upon the jury's answers to the special punishment issues, the trial judge

sentenced him to death. Appellant raises seven points of error. Finding no reversible error,

we affirm the judgment and sentence.

**Factual Background**

In the early hours of October 6, 2003, five-year-old Demetrius Cotton was awakened by the sound of his mother, Mel Cotton, screaming from her bedroom. He went into her room and saw a strange man there–"kind of tall, bald, and buff." He had a mustache and was wearing boots and boxers. He had gloves on his hands. Demetrius saw his mom sitting on the edge of the bed with duct tape on her mouth; the man was standing in front of her, stabbing her in the arms with a sharp knife. She was trying to get away from him. She stood up, but then lost her balance and fell. The man kept stabbing, so Demetrius "ran over and tried to pull him down by his leg." He said, "Stop," but the man pushed him off, turned on the bedside light and continued stabbing at his mom. The man told Demetrius, "sit down and shut up," so Demetrius sat down. He was scared.

Then the man put duct tape on Demetrius's ankles and mouth. He told Demetrius to get out of the room, so the child hopped out into the hallway. The man locked the door when Demetrius tried to get back inside the bedroom. He heard his mom scream, "Leave me alone," but the man said, "Give me the money" and "Where is it at in your purse?" Demetrius hopped into his room and sat on a pallet of blankets beside his bed. He heard the man take his mom's phone and "stomp on it" in the bathroom. The man also cut the telephone cord.

Demetrius fell asleep, but he woke up when he heard the man come into his room. The man "choked" Demetrius with both hands. Demetrius tried to scream, but he couldn't.

He blacked out.  When he woke up later, he had a hole in his chest with blood coming out.  He went to his mom's room.  She was laying on the floor on her side.  Demetrius felt her neck.  It was cold.  "[S]he was gone."  He touched her hand and talked to her for a while.  Then he went to the bathroom for a washcloth to stop his chest from bleeding.   He looked to see if anyone else was there in the apartment.  The man was gone.  Demetrius ate a popsicle, then went back to his room, got his stuffed caterpillar, and waited for a long time for someone to come.  He fell asleep again, but woke up early that Monday morning when he heard knocking on the door.  He took his stool to the door to see out of the peephole, and when he saw his "Aunt Tweety," he opened the door.

Monica Salinas, who lived in the same Austin apartment complex as Mel Cotton and Demetrius, heard a hysterical woman crying, "My sister is dead, my sister is dead, please help me."  She ran up the stairs, saw Demetrius with duct tape still around his neck and Mel Cotton's body in the master bedroom, so she called 911.  She saw "blood everywhere and handprints of blood all over the room."

Paramedics rushed Demetrius to the hospital.  He had four stab wounds in his chest.  They were so deep that a paramedic saw Demetrius's lung inflating and deflating.  Demetrius said that he could hear the air coming out of the hole in his chest; it sounded like "a farting noise."  Demetrius lost twenty to thirty percent of his blood volume and had a pneumothorax (collapsed lung) and a pulmonary contusion.  Doctors also determined that Demetrius had been strangled.  Although his wounds were life-threatening, Demetrius recovered.

The medical examiner testified that Mel Cotton had a total of 107 stab wounds that were inflicted during a drawn-out attack.  Thirty-eight of the wounds were centered around Ms. Cotton's left breast, indicating "some degree of [the victim's] incapacitation or lack of movement."  Another group of wounds were in her back.  She had approximately thirteen defensive wounds to her hands and arms.  Twenty of the wounds reached her internal organs.  She, like Demetrius, had been strangled.  The medical examiner said that Ms. Cotton had probably been conscious for about ten to twenty minutes after her jugular vein had been cut.

Christina Pocharasang, appellant's former girlfriend, learned of Ms. Cotton's murder later that day.  She immediately suspected appellant.  She testified that Ms. Cotton had helped her move out of appellant's apartment two weeks earlier by arranging for a man named Kenneth to haul her heavy furniture.  Appellant had been furious and accused Ms. Cotton and Kenneth of stealing his things, including his vacuum cleaner.[1]  Christina called appellant to ask him about the murder.  When he answered the phone, appellant was breathing heavily and said that he had been in a fight with Kenneth, who had stabbed him in the stomach, causing an injury that required sixteen stitches.  Christina then called the Austin police to report her suspicions.

Austin police discovered that appellant had an outstanding parole-violation warrant

---

[1] Appellant left numerous threatening voicemails for Christina, saying such things as "Yeah, ho, you go on and do what you like.  I don't give a f__ no more .  But I bet you this one thing.  You still got my shit, you keep that.  That's yours.  Since you distributed my shit to all this different mother f____ and shit.  And gave my shit to these niggers.  You gave my shit to these niggers.  But bitch, one day you're going to look up, and you're going to see me.  Bet that."

and went to his apartment to arrest him.  After peeking through his blinds, appellant refused to open the door, so the officers made a forced entry.  Appellant did not have a stab wound in his stomach, but he did have cuts on his right hand that looked like those made when an attacker loses his grip on a knife shaft and cuts his own hand.

Officers obtained a search warrant for appellant's apartment and car.  They found stain remover, bleach, and vinegar containers; a glove on top of the washing machine; and a glove, tennis shoes, and a striped shirt inside the washing machine.  DNA consistent with that of Ms. Cotton's DNA was found on the left tennis shoe, and DNA consistent with that of appellant, Ms. Cotton, and an unknown male[2] was found on the glove on top of the washing machine.  A latent fingerprint, matching appellant's fingerprint, was found on Ms. Cotton's bedroom window blind.

While in jail, appellant bragged to his cellmate about stabbing Ms. Cotton and Demetrius.  He recounted details of the crime, including wrapping Ms. Cotton in an extension cord, washing his bloody clothes, and throwing the knife that he used in a lake.[3]

Appellant called a jail guard, Deputy Tasha Lass, to testify that the inmates did not have much privacy in their jail cells, thus suggesting that perhaps the cellmate could have learned details about the murder from reading appellant's case files in his jail cell.

Appellant also made numerous phone calls from the jail to family members,

---

[2] When the DNA analysis was made, the technician did not have Demetrius's DNA.

[3] During his punishment-stage testimony, appellant confirmed that he threw the knife into the lake.

suggesting to one brother that he might remember that appellant and Mel Cotton had a sexual relationship. Appellant's older brother told appellant to stop asking him, his brother, and their mother to lie for him. These calls were recorded and played at trial.[4] In them, appellant told various versions of the events.

One of appellant's brothers testified at trial to the version of events that appellant told him. According to appellant, he and Mel Cotton had had sex that night, and then he went to sleep in her bed. She later woke him up, and they began arguing. She came at him with a knife, saying that she was going to shoot him with a gun. They struggled over the knife. He got the knife, but when he tried to get dressed and leave, she attacked him again. Demetrius came into the room and "fell" on the knife that his mother was holding. Appellant told his brother that he had stayed with the little boy, giving him pain pills, until Demetrius's aunt arrived the next morning. Appellant told his family members that "wasn't nothing wrong with [Demetrius], he was–he's alive and he wasn't seriously hurt. . . . He wasn't hurt bad at all. He went to school the next day."

The jury found appellant guilty of capital murder.

During the punishment phase, the State introduced appellant's prior convictions for

---

[4] In one of them, appellant told his brother that a jury would surely sentence him to death if they heard that he had attacked and stabbed his mother when he was nineteen, so he wanted his mother to lie about that event. "I can't have her up there. That's, that's suicide. . . . What am I going to look like in these folks' eyes? . . . I mean it's not about telling the truth, get up there and tell the truth, that's suicide, man. . . . How can you say if you love somebody that you're gonna sit up there and, and, and get up there and, and help go to the death chamber? That's suicide for me, man."

burglary of a habitation, robbery, false imprisonment, assault, and dating-violence assault.

Christina Pocharasang testified again and recounted three different violent episodes. One time, several months before the murder, appellant punched her in her face because she did not want to cut her hair the way appellant wanted it cut. He chased her into the bathroom and kept hitting her for about thirty minutes. Then, about two weeks before the murder, appellant got angry when Christina asked him to go to his brother's church. He closed the bedroom door so Christina's son couldn't see him, and he choked Christina with both hands around her neck. Christina decided to move out of town, and she contacted her friend, Mel Cotton, who found Kenneth to help her move. But, in late September, Christina forgave appellant and came back to Austin. One night, appellant attacked her as she was driving. He punched her in the face five or six times, choked her neck, bit her on the shoulder,[5] hit her in her lower back about fifteen times, and crushed her cell phone so she couldn't call for help. He told Christina he was going to kill her. Christina finally escaped, drove to a hospital, and called the police. Nine days later, appellant killed Mel Cotton.

Another woman testified that she had dated appellant in 2002, but he got jealous and began hitting her and grabbing her by the neck when he was angry. She told him that she wanted nothing more to do with him. But one day he came over, and she got into his car to talk to him. Appellant became angry again and, after she jumped out of his moving car, he came after her and started hitting her in the face. Her father called the police and she filed

---

[5] Six years later, Christina still had a scar from that bite.

assault charges against him.

A third woman testified that she had dated appellant when they were both in high school. He was often verbally abusive to her, but one day he got jealous and hit her in the nose, then threatened to kill her as he forcibly took her back to his apartment. The next morning she escaped by grabbing her car keys. She drove off, speeding and running red lights when she saw appellant driving behind her. She stopped, got out of her car and started calling for help, but no one paid attention to her, so she raced back to her car. Appellant was on the roof of her car. She nevertheless drove to a friend's house, got out, and appellant drove off in her car. Several years later, appellant found her in Round Rock, burglarized her friend's home, stole a TV and purse, and kidnapped her. The police eventually found her at appellant's apartment, and he went to prison for burglary. She related another incident in which appellant choked her when he found out she was dating someone else. Even though appellant has been locked up in jail for years, she is still afraid that he will come back for her.

A former cellmate testified that appellant assaulted him while he was lying in his bunk. Appellant said that he was a Muslim and didn't want to be in a cell with a Catholic. Appellant accused the cellmate of farting while appellant was praying, and then he began hitting the man in the chest, saying that he would kill him. The cellmate, in fear of his life, asked to be moved. Appellant had numerous instances of disruptive conduct while in jail and, at one point, was assessed fifteen days of administrative segregation for his actions.

A former female jailer who had given appellant special privileges resigned when her

superiors discovered that she had been "fraternizing" with appellant. Thereafter, she visited appellant in jail seventeen times in six months.

Tasha Lass, the female jailer whom appellant had called to testify during the guilt stage, was called by the prosecution during the punishment stage. She admitted that she, too, had been fraternizing with appellant for several weeks. She said that she had brought appellant a cell phone so he could call her from the jail without their conversations being recorded. They talked on the phone every day, and appellant repeatedly told Deputy Lass that he loved her. She testified that he was still talking to her every day on the smuggled cell phone.

Another jailer testified that, after Deputy Lass's testimony, he had searched appellant's jail cell and found the cell phone stuffed into a bag of Cheetos inside appellant's commissary bag. A cell phone charger was also found. Deputy Lass was then arrested and charged with the felony of bringing a prohibited item into a correctional facility.

Yet another officer testified that a piece of plastic had been wedged into appellant's leg brace that he was required to wear as he was transported each day from the jail to the courtroom so that it would not lock. A different officer testified that appellant had tampered with his leg brace on a second occasion as well. That time appellant was walking around in the open courtroom with his leg brace unlocked.

After the defense offered several mitigation witnesses and rested, the State then recalled Tasha Lass to testify about "an escape plan." This time, Deputy Lass testified that

she had originally been a missionary in Romania, and then had traveled to Sri Lanka, Australia, and England for eight years. She then became a police officer in Chattanooga, Tennessee, and was named Patrol Officer of the Year in 2008. She moved to Austin, became a deputy in June 2009, and first met appellant around Christmastime. She listened to him talk about his case, his family, and his problems in jail. He made her feel "needed." He told her about his escape plan and wanted her to buy a storage shed so he could hide out "with food and stuff" until he escaped to Dubai. He chose Dubai because it is a Muslim country and he could not be extradited from there. He also wanted her a buy a .45 pistol with a silencer and four magazines and bring it into the jail "so he could shoot people and locks to get out."

Appellant told Deputy Lass that he planned to call Deputy Fernandes over to his cell at 2:30 a.m., shoot him, drag the deputy's body into the cell, change into his clothes, grab his car keys,[6] shoot any other inmates who saw him, kill the control-room operator,[7] take the keys to the fire closet, grab the bag inside that closet that contained a rope, then go to the top floor fire closet for another rope, go out the roof door, tie the two ropes together and attach one end to the building, toss the rope over the edge and climb down, run over to the parking garage and drive off in Deputy Fernandes's car. Appellant would "knock out" Deputy Lass and put her in the fire closet, but she did not believe that he would leave her alive. She said that she did not want to aid in this escape plan, but appellant kept asking her every day.

---

[6] Appellant told Ms. Lass that he had seen Deputy Fernandes drive in and out of the parking garage, so he knew which car was his and where it was parked.

[7] Appellant wanted Ms. Lass to be in the control room so she could give him the keys.

The State also called Dr. Richard Coons who testified that, in his opinion, a hypothetical person with appellant's history, conduct, and character would likely pose a danger of violence in the future.

Finally, the defense called appellant to the witness stand. He admitted that he had hurt a lot of women. He said that he had hit his brother over the head with a statue and beaten his mother and the women that he loved. It was because of "anger issues and situations. . . . Maybe sometimes I go overboard."

Based on the jury's answers to the special issues, the trial judge sentenced appellant to death. After hearing a victim allocution statement by Mel Cotton's sister, appellant shouted, "That bitch wasn't no angel. That was a bitch, a motherf___ bitch. F___ all y'all. That was a bitch a ho bitch." When the trial judge attempted to interrupt, appellant said, "No, f__ you. F____ your allocution. F___ all you motherf____."

Thus ended the trial of Milton Dwayne Gobert.

## The Admission of Evidence at the Punishment Phase

In two points of error, appellant complains of the admission of expert testimony offered at the punishment phase. In point of error one, appellant asserts that the trial court erred under *Daubert,*[8] *Kelly,*[9] *Coble,*[10] and the Eighth Amendment in admitting testimony by

---

[8] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

[9] *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

[10] *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

A.P. Merillat, an investigator from the Special Prosecution Unit of the Texas Department of

Criminal Justice (TDCJ), concerning prison conditions and the opportunities for violence in

TCDJ.  The trial judge barred the prosecution from asking "about specific cases that he

knows about" or other anecdotal stories, but otherwise  allowed the State to develop Mr.

Merillat's testimony.

We have upheld the admission of Mr. Merillat's educator-expertise testimony in

several previous cases as reliable and relevant to the future-dangerousness issue concerning

the opportunities for violence in prison society.[11]  But in *Estrada v. State*,[12] we found that Mr.

Merillat's unintentionally inaccurate testimony concerning reclassification of capital-murder

inmates was, in that particular case, reversible error.[13]  Mr. Merillat did not repeat that factual

---

[11] *See Coble*, 330 S.W.3d at 287-89 (Merillat's testimony about the Texas prison classification system and violence in prison, offered to show a capital-murder defendant's future dangerousness, was admissible as educator-expertise information designed to assist the jury; testimony was confined to specific information about operations of Texas prison system and inmates' opportunities for violence or productive behavior; the testimony was intended to educate the jury about an area in which it lacked a thorough understanding and to cast doubt upon the official prison data that the forensic psychologist who testified for defendant relied upon); *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (upholding admission of photographs of bombs and weapons made by inmates to illustrate Merillat's testimony that violence was prevalent in TDCJ prisons).  *See also Sparks v. State*, No. AP-76099, 2010 WL 4132769, *24 (Tex. Crim. App. Oct. 20, 2010) (not designated for publication) ("Merillat's testimony was generalized educator-expertise information designed to 'assist' the jury under Rule 702. Therefore, the trial judge did not abuse his discretion in admitting it after determining that Merillat was qualified to testify as an expert regarding the prison classification system and opportunities for violence in prison" in punishment phase of capital-murder trial).

[12] 313 S.W.3d 274 (Tex. Crim. App. 2010).

[13] *Id.* at 286-87 (when jury sent out note during its deliberations referring to Merillat's inaccurate testimony "that, after 10 years of G–3 status, a sentenced-to-life-without-parole capital murderer could achieve a lower (and less restrictive) G classification status than a G–3 status,"

inaccuracy in the present case.  We conclude that the trial judge did not abuse his discretion in overruling appellant's Rule 702 objections.

Appellant also argues that the trial court's admission of Mr. Merillat's testimony violated his Eighth Amendment right to individualized sentencing because what other prisoners did or did not do in prison was not relevant to appellant.  It was in response to that argument that the trial judge barred the prosecutor from asking Mr. Merillat any questions concerning other inmates or their specific instances of conduct.  But the judge concluded that generalized testimony concerning prison conditions, opportunities for violence, weapons used, and raw data concerning the number of violent acts in TDCJ did not violate the Eighth Amendment focus on individualized sentencing.  Appellant asserts that Mr. Merillat's testimony "is that TDCJ is so grossly incompetent and so dangerous that the safety of all who enter there is in jeopardy."[14]  We do not read Mr. Merillat's testimony as implying that prison "is a relentless death trap" that imperils "the safety of all who enter there."  His point was that TDCJ, like other prisons, cannot protect against all inmate violence.

We have previously upheld the admission of Mr. Merillat's background testimony

---

there was a reasonable probability that the jury relied upon that testimony in reaching its verdict).

[14] Appellant's Brief at 12.  Appellant goes on to assert that Mr. Merillat's "relentless message is that TDCJ is a death trap, and the only way to make sure that Appellant does not add to it is to kill him, since TDCJ is totally ineffectual in safeguarding any of the many, many potential victims who work and enter there."  This may be one way of characterizing Mr. Merillat's testimony, but it is certainly not a necessary one.

over an Eighth Amendment claim in an unpublished opinion.[15]  While the probative value

of Mr. Merillat's testimony pales in comparison to that concerning appellant's specific acts

of violence while incarcerated, its admission did not violate appellant's Eighth Amendment

right to an individualized sentencing procedure.  The jurors could make an Eighth

Amendment "individualized" assessment of appellant's likelihood to commit future acts of

violence based upon his specific actions–some of which he testified to himself–while

incarcerated.[16]

> We overrule appellant's first point of error.

> In his second point of error, appellant claims that the trial judge erred in admitting the

opinion of Dr. Coons on the issue of future dangerousness.  After a voir dire examination

outside the presence of the jury appellant argued, *inter alia*, that Dr. Coons

> does not have and has not propounded a sufficiently valid scientific technique
> or theory that has been accepted as valid by the scientific community.

---

[15] *Espada v. State,* No. AP-75,219, 2008 WL 4809235, *9-10 (Tex. Crim. App. Nov. 5, 2008) (not designated for publication) (upholding admission of Merillat's testimony about violent acts and gangs in prison over defendant's objection that the testimony was unfairly prejudicial and deprived him of the right to an individualized determination of his sentence).

[16] Appellant testified  and discussed his nine years in prison.  He, like Mr. Merillat, talked about the opportunities for violence in prison: "So violence is a part of life in prison, not saying that you go inflict violence, because people that's not part of a gang, like me, you don't go looking for trouble."  Appellant testified at length about prison gangs and noted that security had been "beefed up" since the Texas Seven escape.  He knowledgeably discussed "crash gates," security guards, and the prison classification system.  He talked about how he had gashed open the back of another inmate with a hoe when he was in minimum custody.   He said that he had had five or six fights while in prison, and he "finished them all" but "ain't nobody lost they life" in those fights.  He stated that he told a female prison guard that he "would kick her bitch ass," and he threatened to hit a prison guard with his hoe.  Appellant also said that he had been in four or five fights while awaiting trial in the Travis County jail.

Psychiatry is not the study of prediction of future danger; it is, as he has acknowledged, the study of mental disease and mental disorders. Future dangerousness is not one of these. Basically his qualifications do not relate to making such predictions.

He has failed to identify any scientific literature or documentation that supports this technique, whatever technique he plans to use. . . .

Basically his testimony does not rely upon principles that are involved in the field of psychiatry.

Appellant also filed a motion and brief outlining his reasons for excluding Dr. Coons's opinion testimony under Rules 702-703, as well as the federal and Texas Constitutions. We conclude that the trial judge abused his discretion in admitting Dr. Coons's opinion on future dangerousness[17] in this case for the same reasons that we held it inadmissible in *Coble v. State*.[18] Here, as in that case, Dr. Coons provided no scientific, psychiatric, or psychological research or studies to support his idiosyncratic methodology for predicting whether a hypothetical person would commit future acts of violence.[19]

However, we conclude that the admission of Dr. Coons's testimony was harmless error.[20] Given the overwhelming evidence of appellant's life-long penchant for violence, the circumstances of the capital murder, the evidence of his conspiracy to commit capital

---

[17] Some of Dr. Coons's testimony, such as that relating to "conduct disorder" as "the juvenile version of antisocial personality disorder," a mental disorder described in the DSM-IV that can cause a person to become violent, was relevant, sufficiently reliable, and admissible. Only his "future dangerousness" opinion based on the lengthy hypothetical posed by the State was insufficiently supported by a reliable methodology.

[18] 330 S.W.3d 253 (Tex. Crim. App. 2010).

[19] *Id.* at 277-80.

[20] *See* TEX. R. APP. P. 44.2(b)

murder to effectuate his escape from jail, his own testimony concerning his prior violence

in prison and toward anyone–including his own mother–who angers him, we are confident

that this error did not affect appellant's substantial rights to a fair sentencing trial.[21]

In this trial, unlike that in *Coble*, the jury was not considering the future

dangerousness of a model prisoner.  The evidence in this case showed that, during prior

periods of incarceration, appellant had

- attacked a fellow prison inmate with a hoe, gashing him in the back;

- threatened to hit a prison guard with a hoe;

- threatened to fight other prison guards;

- gotten into "five or six" fights with fellow prison inmates;

- gotten into "four or five" fights with fellow jail inmates;

- developed inappropriate relationships with at least two female jail guards and manipulated them into providing him with contraband or special privileges;

- plotted to murder a jailer and steal his car keys and car to effectuate appellant's escape;

- plotted to kill any other inmates or jailers who might witness that planned escape; and

- manipulated his leg brace so that it could not lock and impede his mobility in the courtroom during his capital-murder trial.

Dr. Coons's opinion concerning a hypothetical person in appellant's position was, at

most, superfluous to the specific testimonial evidence of appellant's proven dangerousness

---

[21] *See Coble*, 330 S.W.3d at 280.

both in prison and in free society.

Furthermore, the State did not emphasize or rely upon Dr. Coons's opinion in closing argument. One prosecutor briefly mentioned Dr. Coons and his methodology:

> Now, remember the analysis that Dr. Coons uses when he is deciding whether someone is going to be a future danger. If this is helpful to you, you can use it. It is one he has used for many years. If there is some other analysis that you want to use, of course, that's fine, too. Remember he looks at the facts of the capital murder, the person's history of violence, his attitude about the use of violence, his personality and behavioral characteristics, his conscience, and the society that he's going to be in.

The other prosecutor did not even mention Dr. Coons during his closing argument, but the defense discounted Dr. Coons's methodology and the basis for his opinion: "Dr. Coons, no literature or scientific study basis for what he does. I mean, anybody could come in and give you that opinion." The jury did not need any expert's opinion to determine whether appellant would likely commit acts of violence in the future just as he had done in the past. They heard it from the horse's mouth. Because the admission of Dr. Coons's opinion testimony was harmless error, we overrule appellant's second point of error.

## Challenges to the Constitutionality of Article 37.071

In his third point of error, appellant asserts that Article 37.071, the statute that sets out the Texas capital-murder sentencing procedure, is unconstitutional for myriad reasons. Appellant relies upon eleven different motions, memoranda, or written objections that he had filed before and during trial. This point of error, combining eleven different and distinct claims, is multifarious, and we could properly dismiss this entire point of error for that

reason.[22]  Nevertheless, in the interest of justice, we will address the three legal theories that appellant briefed on appeal.

Appellant asserts that Article 37.071 is inadequate and unconstitutional because prosecutorial discretion is "too broad to guarantee that the death penalty will be fairly and evenly applied in all 254 counties."  We have repeatedly rejected this claim,[23] and appellant offers no persuasive reasons why those decisions should be overruled.

Appellant also claims that Article 37.071 is inadequate and unconstitutional because the future-dangerousness issue is submitted to the jury, but it is not alleged in the indictment. We have  repeatedly rejected this claim as well,[24] and appellant's arguments do not persuade us that those decisions should be overruled.

Finally, appellant claims that the types of evidence currently used by prosecutors to prove death-worthiness are unreliable and therefore the statute is unconstitutional.  He asserts that, because prosecutors offer testimony by such witnesses as Mr. Merillat and Dr. Coons, "Article 37.071 invites nothing but unfairness in determining who gets the death penalty, how that issue is determined, and the type of evidence typically [relied] on to make that

---

[22] *Aldrich v. State*, 928 S.W.2d 558, 559 n.1 (Tex. Crim. App. 1996); *Sterling v. State*, 800 S.W.2d 513, 518 (Tex. Crim. App. 1990).

[23] *See, e.g., Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004).

[24] *See Threadgill*, 146 S.W.3d at 672 ("'A defendant indicted for capital murder is effectively put on notice that the special issues under Article 37.071 will be raised, so such procedural provisions need not be alleged in the indictment.'") (quoting *Moore v. State*, 969 S.W.2d 4, 13 (1998)).

determination."[25]    But the fact that some prosecutors, in some cases, have offered some

evidence that might be improper does not render the statute unconstitutional in all of its

applications.[26]  And appellant has failed to show that Article 37.071 was unconstitutional as

applied to him as we have already held that (1) the trial judge did not abuse his discretion in

admitting Mr. Merillat's testimony,  and (2) the erroneous admission of Dr. Coons's opinion

testimony in this case was harmless.[27]   Appellant's third point of error is overruled.

### The Mid-Trial Continuance to Investigate Tasha Lass

In point of error four, appellant asserts that the trial judge erred in failing to grant a

longer mid-trial continuance so the defense could investigate the background and testimony

of its own witness, Deputy Tasha Lass.  And, in point of error five, appellant asserts that his

trial attorneys were ineffective in failing to investigate Deputy Lass before calling her as a

witness in the defense case-in-chief.

As noted above, appellant called Deputy Lass in the guilt stage to testify to the lack

of privacy in the Travis County jail cells.  Her testimony could explain how appellant's

cellmate might have learned about the details of the capital murder from a source other than

---

[25] Appellant's Brief at 28.

[26] *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518  (Tex. 1995) (facial constitutional challenge requires a showing that a statute is unconstitutional in every application); *Gillenwaters v. State*, 205 S.W.3d 534, 536 n.2 (Tex. Crim. App. 2006).

[27] *See Gillenwaters*, 205 S.W.3d at 537 n.3 ("A claim that a statute is unconstitutional 'as applied' is a claim that the statute, although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances.").

appellant's confession to him. When the defense requested that Deputy Lass be allowed to remain in the courtroom after her short testimony was complete, however, the prosecutors' suspicion were aroused. They investigated and later called Deputy Lass during the punishment phase to testify to her improper relationship with appellant and to the fact that appellant had manipulated her into sneaking a cell phone into the jail for him. The State called her again when, at the suggestion of her own attorney, she admitted that appellant had tried to talk her into bringing him a .45 pistol, silencer, and four magazines of ammunition to help him implement his escape plan.

After hearing the testimony of the escape plan, appellant's counsel made an oral motion for continuance because Deputy Lass's testimony was "highly inflammatory" and "devastating, to say the least. . . . I mean, for all we know she may be psychotic." Counsel explained, "We need to have my investigator check her background, check some of the stuff she said, whether or not it's true, classic impeachment stuff that we're now being denied because all of a sudden this stuff just came up."

The trial judge told the prosecutors to give defense counsel any criminal record they could find on Deputy Lass, and he suggested that counsel take her on voir dire to "establish a baseline" for impeachment research. After completing that voir dire, the trial judge postponed cross-examination until the next day to give the defense time to research possible avenues of impeachment. The next day, defense counsel said that they had not had enough time to make a thorough investigation, so the trial judge gave them a daylong continuance

and ordered jailers to permit defense counsel to view appellant's cell and the jail layout.

When the court reconvened, defense counsel made another oral motion for continuance. At that point, the trial judge overruled the motion, stating that cross-examination was likely the best means of discovering information because he would not allow other witnesses to impeach Deputy Lass on collateral matters.

First, we hold that appellant failed to preserve error because he did not file a sworn written motion for continuance.[28] Although he might be excused from filing a written motion immediately after Deputy Lass's direct examination, he clearly had an opportunity to file a written motion the next day–when the trial judge granted a daylong continuance–or the day after that–when the trial judge denied any further continuance. Moreover, appellant did not file a motion for new trial on this basis, setting out what specific admissible impeachment evidence he would have discovered had a longer continuance been granted.[29]

Second, appellant has failed to show that the trial judge abused his discretion in declining to grant a lengthier continuance because he has not shown any prejudice. In *Gallo*

---

[28] *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999); *see* TEX. CODE CRIM. PROC. art. 29.03 ("A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion. A continuance may be only for as long as is necessary."); *id.,* art. 29.08 ("All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance.").

[29] *See, e.g., Varela v. State*, 561 S.W.2d 186, 191 (Tex. Crim. App. 1978) (no error in denying motion for continuance when there is no motion for new trial alleging the failure of the trial court to grant a motion for continuance and no evidence showing what a missing witness would have testified to); *Love v. State*, 730 S.W.2d 385, 401 (Tex. App.–Fort Worth 1987, no pet.); *Chambliss v. State*, 633 S.W.2d 678, 682-83 (Tex. App.–El Paso 1982), *aff'd on other grounds*, 647 S.W.2d 257 (Tex. Crim. App. 1983).

*v. State*,[30] we held that "a bare assertion that counsel did not have adequate time to interview the State's potential witness does not alone establish prejudice."[31] Here, appellant has failed to show what impeachment evidence he would have uncovered if he had been granted a longer continuance and how the inability to present that admissible evidence caused his trial to be unfair.[32]

Finally, to establish reversible error based on the denial of a motion for continuance, "a defendant must demonstrate both that the trial court erred in denying the motion and that

---

[30] 239 S.W.3d 757 (Tex. Crim. App. 2007).

[31] *Id.* at 764; *see also Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996) (capital-murder defendant who asserted that trial judge abused his discretion by refusing to grant a motion for continuance because he had not had sufficient time to interview witnesses failed to show any specific prejudice; thus, no error in denying motion). *See also Quinones v. State*, No. 13-10-00140-CR, 2011 WL 3841586, *3 (Tex. App.–Corpus Christi Aug. 25, 2011, n.p.h.) (not designated for publication) (trial judge did not abuse discretion in denying motion for continuance when defendant claimed that he did not have sufficient time to fully investigate State's witness and recently obtained medical records to conduct effective cross-examination because defendant failed to show specific prejudice); *Lutz v. State*, No. 04-04-00236-CR, 2005 WL 1551722, *1-3 (Tex. App.–San Antonio July 6, 2005, no pet.) (not designated for publication) (trial judge did not abuse his discretion in granting only a fifteen-minute recess to allow defense counsel to interview State's "surprise" eyewitness; defendant failed to demonstrate actual prejudice or show "what length of time would have been sufficient to allow him to adequately prepare" for witness's testimony).

[32] *See Cooper v. State*, 509 S.W.2d 565, 567-68 (Tex. Crim. App. 1974) (trial judge did not abuse his discretion in denying mid-trial motion for continuance when defendant claimed he was "surprised" by a State's witness identifying him as one of the robbers although, before trial, she had told defense counsel that she could not identify defendant; "Neither the motion for continuance nor any statement by appellant's counsel found in the record indicated to the trial court how counsel could have benefitted by a continuance, or that there was any expectation that a continuance would enable appellant to present any fact or facts contrary to the identification testimony given by [the surprise witness].").

the lack of a continuance harmed him."[33]   That is, appellant must offer evidence to satisfy three separate prongs:   (1) the trial judge abused his discretion in failing to grant a continuance because he would have discovered admissible impeachment evidence about Deputy Lass;  (2) his cross-examination of Deputy Lass was circumscribed as a result of that ruling; and (3) his inability to fully cross-examine Deputy Lass with admissible impeachment evidence was so critical that it caused his sentencing hearing to be unfair and the result unreliable.  Appellant has not satisfied any of those three prongs.  We therefore overrule his fourth point of error.

In his fifth point of error, appellant asserts that his trial counsel were constitutionally ineffective because they failed to investigate Deputy Lass before calling her to the witness stand.  As the State notes, it was appellant who suggested that his attorneys should call Deputy Lass.   Nonetheless, Deputy Lass's testimony concerning her inappropriate relationship with appellant, her conduct in smuggling in a cell phone for him, and appellant's confiding his murderous "escape plan" to her is so unexpected that we cannot find that counsel's failure to independently investigate the potential for this type of relationship was deficient conduct.

Counsel has a duty to conduct an independent investigation into the facts of the case and "should not blindly rely on the veracity either of his client's version of the facts or

---

[33] *Gonzales v. State,* 304 S.W.3d 838, 843 (Tex. Crim. App. 2010).

witness statements in the State's file."[34] But counsel's duty to investigate his own witnesses and their relationship to the client is not absolute; he is obliged only to make a reasonable decision as to whether a particular investigation is necessary.[35] Reviewing courts "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."[36] Thus, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."[37]

Appellant fails to explain why his counsel should have anticipated that Deputy Lass was carrying on an improper relationship with appellant and would testify to the cell-phone-smuggling incident or the "escape plan." Appellant himself knew these facts, of course, but they are so unusual and unlikely that an objectively reasonable attorney is not deficient for failing to investigate the possibility of such a relationship before calling a deputy to testify to the lack of privacy in jail cells.[38] We cannot conclude that counsel's conduct in this regard

---

[34] *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996).

[35] *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984) ("counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary.") (emphasis added).

[36] *Id.* at 689-90.

[37] *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011).

[38] *See id.* (counsel need not be prepared for "any contingency"; defense attorney was not ineffective for failing to retain forensic expert when he reasonably believed that State was not going to call its own forensic expert and State originally had not planned to call any expert).

fell below prevailing professional norms, especially as the prosecutors and trial judge were clearly just as astounded by this evidence as appellant's counsel. The only two people who knew about this evidence were appellant and Deputy Lass; if appellant did not want this relationship exposed, he should not have suggested Deputy Lass as a witness.

Appellant's counsel had no reason to suspect any secret relationship between appellant and a law-enforcement officer and thus no reason to investigate that relationship or the officer's background. "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."[39] To hold otherwise, would require counsel to be prepared for "any contingency" regardless of how improbable or remote it may be and would require counsel to divert scarce resources to investigate minor law-enforcement witnesses whose veracity and integrity may normally be assumed.[40]

Furthermore, we should not find that counsel's failure to investigate Deputy Lass's relationship with appellant before calling her as a minor witness was "so outrageous that no competent attorney would have engaged in it," without affording counsel the opportunity to

---

[39] *See id.* at 789.

[40] *See id.* at 791 (holding that lower court had erred in suggesting that counsel must be prepared for "any contingency"); *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (stating that there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect"); *Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009) (per curiam) (counsel may avoid investigation likely to yield only cumulative evidence because it will "distract[] from more important duties").

explain.[41]  Because appellant has not shown constitutionally deficient performance by his

counsel, we need not address the second, prejudice prong of *Strickland*.[42]  We overrule

appellant's fifth point of error.

### Trial Counsel's Statement that Appellant Was Testifying "Against the Advice of Counsel"

In his sixth point of error, appellant complains that his trial counsel provided

ineffective assistance of counsel by telling the jury that appellant was testifying against the

advice of counsel.  He claims that trial counsel undermined his Fifth and Sixth Amendment

right to testify by letting the jury know that counsel thought it was a bad idea.

At the end of the punishment phase, appellant's counsel informed the trial judge,

outside the presence of the jury, that appellant insisted on exercising his right to testify.  All

three defense counsel were concerned and registered their opposition, on the record, to

appellant's decision.  When lead counsel began his direct examination of appellant before

the jury, he acknowledged his disagreement with appellant's decision to testify and

characterized appellant's decision to plead for his life as one that would subject him to

---

[41] *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) ("'[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'  Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'") (citations and footnotes omitted).

[42] *Strickland*, 466 U.S. at 694 (to establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

"dehumanization" by the prosecutor.[43]  This introductory colloquy–that appellant wanted to take the witness stand to make a plea for his life even though he knew the prosecutor would attempt to shred his story and dehumanize his actions–set the stage for the beginning of counsel's impassioned closing argument at punishment: "Milton Dwayne Gobert wanted his opportunity to come up here and basically ask each one of you, don't take my life.  And I know he did something very terrible and it's going to be hard for you to listen to his plea.  All I can do is say, please, don't take his life."  Then, at the end of his argument, counsel circled back again to the colloquy at the beginning of appellant's testimony and plea for his life: "I am pleading with you.  He pleaded with you.  He said, spare my life, spare my life."

Appellant cites no case law from any jurisdiction holding that counsel's introductory questions expressing concern about a defendant's decision to testify and subject himself to cross-examination are constitutionally deficient.  As the State points out, the limited authority

_____

[43] The colloquy was as follows:

Q:    Mr. Gobert, you asked–you asked to address this jury; is that correct?
A:    Yes, sir.
Q:    Let me just go through some ground rules with you, okay, because you and I don't necessarily agree with this, correct?  It that right?
A:    Yes, sir, we don't agree.
Q:    And you know that I have concerns that because you are taking the witness stand they are going to be able to question you about everything and try to make you look bad.  You saw what happens on that witness stand to witnesses.  You know what happens to them, don't you?
A:    Yeah.  It is not a concern, though, to me.
Q:    Okay.  But you wanted to address this jury and make a plea for you life, didn't you?
A:    Yes, sir.
Q:    Even though in making that plea for your life, now they are going to put you under intense cross-examination to dehumanize you.  Do you know that?
A:    Well, they did–done a lot of dehumanizing, yes, sir.  I'm not concerned with that.

on this issue indicates that counsel's conduct was both reasonable and non-prejudicial. The

State cites to *Noel v. Norris*,[44] in which the Eighth Circuit upheld the state court's finding that

counsel's statement during direct examination that his client–a capital-murder defendant–was

testifying against counsel's advice "was designed to impress the jury with [the defendant's]

sincerity."[45] The Eighth Circuit held that "[t]he trial strategy that counsel pursued was not

professionally unreasonable. Our conclusion finds strong support in the fact that [the

defendant] could not identify, nor could we find, a single case where counsel, under similar

facts, was found to be ineffective."[46]

The record in this case reflects that counsel's apparent strategy was a reasonable one:

he was framing appellant's decision to testify and plead for his life as something he felt so

strongly about that he was willing to risk the consequences of a merciless cross-examination.

As the State notes, "Counsel used the opportunity to frame the State's subsequent cross-

---

[44] 322 F.3d 500 (8th Cir. 2003).

[45] *Id.* at 502. The colloquy in that case, as described by the Arkansas Supreme Court, was as follows:

Q:    All right. Now, Riley, you're taking the stand here because you want to tell the jury your story. Is that correct?
A:    Yes, sir.
Q:    And that's over my advice?
A:    Yes, sir.
Q:    Against my advice?
A:    Yes, sir.

*Noel v. State*, 26 S.W.3d 123, 127 (Ark. 2000).

[46] 322 F.3d at 502.

examination as dehumanizing not only of appellant but also of other witnesses."[47]

Appellant asserts that the colloquy concerning the advisability of testifying takes place outside the presence of the jury, but "[i]n this case the colloquy took place taken front of the jury, and was of benefit only to trial counsel," not appellant.[48]  This is not entirely accurate. All three counsel expressed their disagreement with appellant's decision to testify on the record outside the presence of the jury.  Counsel had no need to "benefit himself" by repeating that disagreement in front of the jury.  The record supports the inference that this strategy was designed to benefit his client and emphasize how strongly appellant wanted to make a sincere personal plea to the jury for mercy.

We find that appellant has failed to establish that his counsel provided ineffective assistance of counsel in his strategy of framing appellant's choice to testify despite counsel's concerns about a "dehumanizing" cross-examination. Because we find that counsel's performance was not constitutionally deficient, we need not address the second, prejudice prong of *Strickland*.[49]  We overrule appellant's sixth point of error.

### The Search Warrant Affidavits

In his seventh and final point of error, appellant claims that the trial judge erred in failing to grant his motion to suppress evidence of his DNA and items taken from his

---

[47] State's Brief at 59.

[48] Appellant's Brief at 33.

[49] 466 U.S. at 694.

apartment and car under four separate search warrants.  He argues that the first two affidavits did not establish probable cause to search and the second two affidavits were based, in part, on his illegally obtained confession.  He claims that, without the inclusion of those statements, the magistrate lacked a substantial basis for concluding that there was probable cause to search appellant's apartment or obtain his DNA.  We conclude that all four affidavits contain sufficient, lawfully obtained, information to support a finding of probable cause to search.

At a pretrial hearing, the trial judge granted appellant's motion to suppress his confession.  The judge found that, at the beginning of the interview, appellant had invoked his Fifth Amendment right to counsel, thus the detectives violated his *Miranda* rights in continuing to question him after that invocation.[50]  Appellant then filed a motion to suppress evidence obtained from four separate search warrants.

At the suppression hearing, Officer Fuentes testified that he prepared affidavits on October 7, 2003, to search appellant's apartment and car.  He drafted those affidavits and search warrants–State's Exhibit 5 & 6–at the time that appellant was being interviewed by others, and he did not rely upon any information from that ongoing interview.  In his affidavit, Officer Fuentes relied upon information

- from Demetrius that the murderer was "a male, not white, with a shaved head and mustache wearing a striped shirt and silver shorts," and Demestrius's

---

[50] The State pursued a pretrial appeal of this ruling, but this Court ultimately upheld the trial judge's ruling excluding the confession. *State v. Gobert*, 275 S.W.3d 888, 889 (Tex. Crim. App. 2009).

statement that the murderer put his mother's purse inside a black bag that the man brought with him;

- from Christina Pocharansang that she suspected appellant was the murderer and her report that appellant had assaulted her the previous month, so she called Ms. Cotton to help her secretly move out of appellant's apartment, that Ms. Cotton had several friends help her move out, but in the process "they stole some of Gobert's property";

- that appellant had open arrest warrants for parole violations and assault;

- that when officers went to arrest appellant at his apartment, the manager showed them appellant's blue Taurus car;

- that when officers arrested appellant, they saw what appeared to be blood in several places on the living room carpet;

- that, after arresting appellant, one of the officers looked into appellant's blue Taurus and saw "what appeared to be blood on the steering column and on the driver's door lock";

- that, after arresting appellant, the officers saw knife cuts on appellant's hands;

- from appellant's brother's girlfriend that appellant arrived at their apartment shortly after the murders to take a shower and when he arrived he was carrying a black duffel bag.

Officer Fuentes went through all of this information and verified that none of it came from appellant. The magistrate found probable cause to search both appellant's apartment and car based on this information and officers conducted those searches, under warrant, the next day. They seized numerous items of evidentiary value.

Detective Burgh then compiled a second search warrant for appellant's apartment on October 15, 2003. This affidavit includes the same information as that in the first two affidavits, but added some information from appellant's confession as well. The only

evidence seized under this third warrant was a black and blue bag with toiletries in it. Det. Burgh also compiled a November 5, 2003, search warrant and affidavit to collect appellant's DNA. That affidavit included the same information that was in the October 7th affidavits as well as information from appellant's confession.

The trial judge overruled the motion to suppress evidence and entered findings that the first two search warrant affidavits contained sufficient facts to establish probable cause and the second two affidavits contained sufficient facts to establish probable cause, even after appellant's illegally obtained statements were excluded.

The Fourth Amendment expresses a strong preference for searches to be conducted pursuant to a search warrant based on probable cause.[51] "Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a 'fair probability' or 'substantial chance' that contraband or evidence of a crime will be found at the specified location."[52] Our duty, and that of the trial judge, in reviewing the magistrate's finding of probable cause "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."[53] As appellant aptly noted, reviewing courts do not act as a "rubber stamp," but "the magistrate's decision should carry

---

[51] *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007).

[52] *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010) (citing *Gates*, 462 U.S. at 243 n.13).

[53] *Flores*, 319 S.W.3d at 702.

the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon de novo review."[54]

Appellant argues that, at the time the first two affidavits were drawn up, "there was a lot of circumstantial evidence included, but the crux of the affidavits" was Christina's "guess" that appellant was the murderer. We disagree. The magistrate had before him not only Christina's suspicion, but also her cogent reasons for that suspicion, as well as the evidence of bloodstains on appellant's carpet, bloodstains on his car steering column and driver's door lock, evidence of cuts–apparently superficial knife wounds–on appellant's hands, evidence that appellant had arrived at his brother's apartment shortly after the murders to take a quick shower and then leave, and Demetrius's description of the murderer–a description consistent with appellant's appearance.

Based on the totality of the information contained in the first two affidavits and giving "great deference" to the magistrate's finding, we agree that the magistrate had a "substantial basis" for concluding that the affidavits established probable cause to search appellant's car and apartment.[55]   Thus, the trial judge did not err in denying appellant's motion to suppress evidence obtained as a result of the first two search warrants.

As for the second two search warrants, State's Exhibits 7 & 8, the affiant repeated,

---

[54] Appellant's Brief at 36 (quoting WAYNE LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.7(c) at 452 (4th ed. 2004 & Supp. 2009-2010)).

[55] *State v. Jordan*, 342 S.W.3d 565, 569 (Tex. Crim. App. 2011); *Flores*, 319 S.W.3d at 702.

almost verbatim, all of the information contained in the first two affidavits and then added more facts gleaned from appellant's illegally obtained confession.  However, we agree with the trial judge's finding that, excising the additional information from that confession, there is still ample information in the affidavits to support the second search of appellant's apartment and the search to obtain his DNA.[56]

We therefore overrule appellant's final point of error.

Finding no reversible error, we affirm the trial court's judgment and sentence.

Delivered: November 23, 2011
Do Not Publish

---

[56] *See United States v. Karo*, 468 U.S. 705, 721 (1984) (search-warrant affidavit, after striking of facts about illegal beeper monitoring inside a residence, contained sufficient untainted information to establish probable cause for issuance of search warrant); *United States v. Restrepo*, 966 F.2d 964, 970-71 (5th Cir. 1992) (in assessing whether search warrant contains sufficient untainted information to establish probable cause, court should excise illegally obtained information and then decide whether remaining information suffices); *cf. Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (in deciding whether intentional misrepresentations in warrant affidavit require suppression of evidence obtained as a result of search, courts must excise the false information and decide if sufficient, untainted information exists to establish probable cause in affidavit); *Klingenstein v. State*, 624 A.2d 532, 538 (Md. 1993) (the existence of tainted information in search-warrant affidavit does not necessarily render warrant invalid; remaining, untainted information should be examined to determine if it suffices to establish probable cause).